# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**TOMMY TURNER,**

       **Petitioner,**

**vs.**                            **No. CIV 01-1137 JP/LCS**

**LAWRENCE TAFOYA,**

       **Respondent.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court on Respondent's Motion to Dismiss (Doc. 11), filed December 17, 2001, Petitioner's Motion for an Evidentiary Hearing (Doc. 20), filed September 6, 2002 and the merits of the Petition for a Writ of Habeas Corpus. The United States Magistrate Judge, having considered the arguments of counsel, record, applicable law, and being otherwise fully advised, finds that Petitioner's Motion for an Evidentiary Hearing should be **DENIED**, Respondent's Motion to Dismiss should be **GRANTED**, and the Petition should be **DENIED**.

## PROPOSED FINDINGS

1.      Petitioner, proceeding *pro se* and *in forma pauperis,* is serving a life sentence pursuant to the Judgment and Sentence, issued February 20, 1998, in the case styled *State of New Mexico v. Tommy Turner* and numbered CR 95-90FR, Fifth Judicial District, County of Lea, State of New Mexico.  After he was convicted by jury verdict of first degree murder, Petitioner was sentenced to life imprisonment, to be followed by five years parole.  (Answer, Ex. A.)

2.      On March 2, 1998, Petitioner, through trial counsel Glenn Williamson, Esq., filed a Motion for New Trial.  (Answer, Ex. B.)  On March 3, 1998, the trial court denied this Motion.

(Answer, Ex. C.) Petitioner, again through Mr. Williamson, filed a Notice of Appeal and a Docketing Statement. (Answer, Exs. D and E.)

3.        On direct appeal to the New Mexico Supreme Court, Petitioner was represented by Lauren Baldwin, Esq. (Answer, Ex. G.) On appeal, Petitioner argued that the trial court erred in permitting the State to impeach his testimony using a prior juvenile conviction and by refusing a defense request to admit the results of a polygraph examination administered to a State's witness. (Answer, Ex. L.) After briefing and oral argument, (Answer, Exs. G-K), the New Mexico Supreme Court affirmed Petitioner's conviction on January 3, 2000. (Answer, Ex. L.)

4.        On April 2, 2001, Petitioner, represented by Todd Hotchkiss, Esq., filed a petition for a writ of habeas corpus in the state district court, contending that Mr. Williamson rendered ineffective assistance of counsel. (Answer, Ex. N.) The State filed its Response on May 1, 2001. (Answer, Ex. O.) On May 22, 2001, the state district court denied the petition for a writ of habeas corpus in a one-page order without hearing or explanation. (Answer, Ex. P.) Petitioner filed a petition for a writ of certiorari with the New Mexico Supreme Court on June 20, 2001, presenting the issues raised in the state habeas petition. (Answer, Ex. P.) On July 12, 2001, the New Mexico Supreme Court denied the petition for a writ of certiorari. (Answer, Ex. R.) Petitioner filed his federal Petition pursuant to 28 U.S.C. § 2254 on October 1, 2001.

5.        Petitioner's convictions became final on April 3, 2000, ninety days after denial of certiorari by the state supreme court. *See Rhine v. Boone*, 182 F.3d 1153, 1156 (10th Cir. 1999) (holding a state court conviction does not become final until the time for filing a certiorari petition expires); Sup. Ct. R. 13 (time for filing certiorari petition expires ninety days after state supreme court rules). The one-year limitations period for filing a federal habeas corpus petition began to run

on that date.  *See* 28 U.S.C. § 2244(d)(1)(A).  On April 2, 2000, Petitioner filed his state habeas

petition, (Answer, Ex. N.), tolling the one-year period.  28 U.S.C. § 2244(d)(2).  The state habeas

application remained pending until July 12, 2001, when the New Mexico Supreme Court denied the

petition for a writ of certiorari.  (Answer, Ex. R.)  Thus, the §2254 Petition, filed within one year of

July 12, 2001, is timely under 28 U.S.C. §2244(d).

6.    Petitioner raises the following issues in his federal Petition:

I.    Mr. Williamson rendered ineffective assistance of counsel by failing to investigate the State's witnesses for past criminal acts or credibility while having a lack of physical evidence for trial.

II.   Mr. Williamson rendered ineffective assistance of counsel by failing to adequately challenge Tommy Shanks' credibility as a witness, after Mr. Shanks admitted on the stand during trial that he was untruthful in previous testimonies while under oath.

III.  Mr. Williamson rendered ineffective assistance of counsel by failing to file a motion for disclosure of the confidential informant in a timely manner therefore failing to allow the right to confront and cross examine all witnesses.

7.    Respondent moved to dismiss on December 17, 2001, arguing that Petitioner failed

to establish ineffective assistance of counsel under the standard of *Stickland v. Washington*, 466 U.S.

668, 687 (1984).  (Doc. 11.)  On February 5, 2002, after determining that the Motion to Dismiss

should be addressed in conjunction with the merits, I appointed counsel to represent Petitioner,

directed Respondent to file the record proper, and set a briefing schedule on the merits.  (Doc. 13.)

Petitioner filed a Motion for an Evidentiary Hearing on September 6, 2002.  (Doc. 20.)  The issues

raised in the Petition, the Motion to Dismiss, and Motion for an Evidentiary Hearing are now fully

briefed and ready for decision.

8.    On January 14, 1995, a confidential informant reported to the Hobbs Police

Department that John Bonilla, an alcoholic homeless man, had been killed in Hobbs on January 3, 1995. (Record Proper at 22.)  The informant stated that Bonilla had been drinking beer with Petitioner and Christopher Williams at Petitioner's home. (*Id.*)  Bonilla was struck on the head with a club, strangled, loaded into Williams' truck, taken to an area west of town and buried. (*Id.*)  The informant additionally stated that Bonilla was robbed of cash and that Petitioner later used the cash to get a tattoo. (*Id.*)

9.      On January 24, 1995, Hobbs Police Detective Danny Carter interviewed Williams. (Record Proper at 8.)  In exchange for use immunity, Williams gave a statement accusing Petitioner of killing Bonilla. (Answer Ex. L.)  Williams' first statement was materially consistent with the information given by the confidential informant.  (Record Proper at 8-9.)  Additionally, Williams recounted that Petitioner pulled out a hunting knife immediately after they dumped Bonilla's body and at that time Williams walked back to his truck. (*Id.*)  Williams also added that Bonilla's billfold had been burned and stuffed in a fence post in Petitioner's backyard. (*Id.*)  Williams acknowledged that he participated in the homicide and concealment of the body and led police to the location of the body. (Answer Ex. L.)  Bonilla's throat had been cut. (Record Proper at 23.)  Petitioner was arrested that evening and charged with murder.  (Answer, Ex. L.)

10.     Petitioner's first trial, which began on August 20, 1996, ended in a mistrial when Williams, during cross examination, referred to a polygraph examination given to him by the State. (Answer, Ex. L.)  The second trial commenced on February 17, 1998.  (RP at 155.)  Testimony at the second trial established that Petitioner and his father, Jack, had befriended Bonilla and permitted Bonilla to stay in their home. (TT3 29.2.)  Petitioner discussed robbing Bonilla with Williams before the incident. (TT3 30.1.)  On January 3, 1995, Petitioner took Bonilla to cash Bonilla's social

security check and to do some shopping. (TT15 6.7 and 18.5.)  Bonilla bought a bus ticket to California departing that night, but the bus ticket was never used.  (TT5 7.4.)

11.     Williams testified that at about 6:00 p.m. on January 3, 1995 Williams, Petitioner, and Bonilla were at Petitioner's house drinking beer and eating pizza. (TT3 32.1.)  Petitioner told Williams that he was going to kill Bonilla and take his money.  (TT3 35.8)  As Williams, Petitioner, and Bonilla were leaving the house, Petitioner hit Bonilla on the head with a billy club and strangled him up, first against the door frame and then on the floor by the clothes dryer.  (TT3 33.1-35.2.) Petitioner told Williams to bring his truck to the back door.  (TT3 35.3) Williams complied.  When Williams reentered the house, Petitioner had something like a spark plug wire wound around Bonilla's neck. (TT3 at 35.4.)  Williams helped Petitioner bind Bonilla's hands and feet with shoe laces.  (TT3 at 36.1.)  Petitioner and Williams then loaded the body into the truck.  (TT3 at 38.1.)

12.     After picking up some shovels from Petitioner's shop, (TT3 at 44.3), Petitioner and Williams drove towards Artesia, stopped at a field, dragged the body out of the truck and partially covered it with dirt.  (TT 3 at 40.1.)  Petitioner pulled out a hunting knife and Williams walked back to the truck.  (TT3 at 40.3.)  On the way back to town, Petitioner threw the knife out of the passenger side window.  (TT4 9.2.)  Williams dropped Turner off at his house and went home.  (TT4 9.7.)  Williams did not see Petitioner take any money from Bonilla.  (TT4 11.2.)  Petitioner got a new tattoo a day or two after the murder and did not tell Williams how he paid for it.  (TT4 12.2-12.4.)

13.     Tommy Shanks, a friend of Petitioner's, testified that Petitioner described the details of the murder to him on January 4, 1995.  (TT11 35.9-38.9.)  The following day, Petitioner gave Shanks some combat boots that he was throwing out.  (TT11 39.6.)  Shanks told his mother about the murder and she told Shanks to put the boots in a bag.  (TT11 40.7.)  Four or five days later,

Shanks and his mother turned the boots over to the police.  (TT11 43.1.)  Shanks' sister, Sherry,
overheard Shanks talking about the murder and on January 13, 1995, asked Shanks if what he said
was true; he told her it was. (TT12 14.1.) Petitioner told Shanks that Petitioner paid for his new
tattoo with the money he stole from Bonilla and showed Shanks a carpet stain that he said was
Bonilla's blood.  (TT11 44.5; 46.5.)  Bonilla's partially burned wallet was found stuffed inside a fence
post in Petitioner's backyard.  (TT5 at 34.5.)

        14.    On cross examination, Mr. Williamson brought out that Shanks' testimony at trial was
inconsistent with his testimony at the preliminary hearing. (TT11 12.3.)  At the preliminary hearing,
Shanks stated that he learned about the murder from Williams.  (*Id*.)  Shanks explained that at the
time of the preliminary hearing, he did not believe that Petitioner would do such a thing and he did
not want to get Petitioner in trouble.  (TT12 25.3.)

        15.    Detective Carter testified that on January 13, 1995, a confidential informant reported
that Bonilla had been murdered. (TT5 17.1.)  After Williams gave his statement, officers cut off a
fencepost at Petitioner's house and found portions of a burned wallet containing identification cards
in Bonilla's name.  (TT5 34.4.)  On cross examination, Williamson asked Detective Carter the identity
of the confidential informant.  (TT5 44.3.)  The judge reprimanded Williamson for failing to follow
the proper procedure and instructed the jury that Carter did not have to answer the question because
Williamson had not complied with the rule on disclosure of confidential informants.  (TT6 1.3.)
Williamson was permitted to examine Carter on the reliability of information previously supplied by
the informant and how she had learned about the subject murder.[1]  (TT6 3.5.)  Carter recounted that

---

        [1] During the course of the trial, it became obvious that the confidential informant was
Sherry Shanks.

the informant had overheard a conversation between unidentified individuals about the murder.  (TT6
8.2.)

16.     Forensic pathologist Dr. Nashelsky testified that the cause of Bonilla's death was
strangulation.  (TT8 at 7.2.)  The jugular vein on Bonilla's left front neck had a deep cut that caused
minimal bleeding and was apparently made near the time of death.  (TT8 8.4.)  Bonilla's blood
alcohol level was .18.  (TT8 10.6.)  Williams' tennis shoes tested positive for blood, but its origin
could not be determined.  (TT10 5.2.)  Blood found on a number of items in Petitioner's house was
not from either Petitioner or Bonilla (TT10 19.1.)  Petitioner's girlfriend, Jennifer Wilkerson, testified
that she was present when Petitioner got a skull tattoo on January 7, 1995.  (TT14 31.5.)

17.     Petitioner testified that Bonilla came to his house on the evening of January 3, 1995
to take a shower and do some laundry.  (TT15 9.2.)  Petitioner, Bonilla, and Williams drank beer and
ate pizza.  (TT15 11.3.)  Petitioner testified that Bonilla left his house about twenty to thirty minutes
after Williams did, at about 9:00 p.m. or 9:30 p.m.  On cross examination, the prosecutor asked
Petitioner whether he had ever been convicted of a felony.  Petitioner responded that he had not.
(TT15 30.6.)  The prosecutor then asked if he had admitted on October 7, 1991, that he had
committed a burglary.  Petitioner admitted that he had, but that he did not realize that it was a felony.
(TT15 31.1.)  It was a juvenile conviction that occurred when Petitioner was 14 or 15 years old.
(TT15 31. 4.)  Williamson did not object.

18.     The jury found Petitioner guilty of first degree murder on February 19, 1998.  (RP at
174.)  On March 2, 1998, Mr. Williamson filed a Motion for New Trial on Petitioner's behalf.
(Answer, Ex. B.)  On March 3, 1998, the trial court denied this Motion.  (Answer, Ex. C.)  Mr.
Williamson filed a timely Notice of Appeal and a Docketing Statement.  (Answer, Exs. D and E.)

19.    On direct appeal, Petitioner argued that the trial court erred in permitting the State to impeach his testimony using a prior juvenile conviction and by refusing a defense request to admit the results of a polygraph examination administered to a State's witness.  (Answer, Ex. L.)  After briefing and oral argument, (Answer, Exs. G-K), the New Mexico Supreme Court affirmed Petitioner's conviction on January 3, 2000.  (Answer, Ex. L.)

20.    On April 2, 2001, Petitioner filed a state petition for a writ of habeas corpus, contending that Mr. Williamson rendered ineffective assistance of counsel as he argues herein. (Answer, Ex. N.) The State filed its Response on May 1, 2001.  (Answer, Ex. O.) On May 22, 2001, the state district court denied the petition for a writ of habeas corpus in a one-page order without hearing or explanation. (Answer, Ex. P.)  Petitioner filed a petition for a writ of certiorari with the New Mexico Supreme Court on June 20, 2001, presenting the issues raised in the state habeas petition.  (Answer, Ex. P.)  On July 12, 2001, the New Mexico Supreme Court denied the petition for a writ of certiorari without opinion.  (Answer, Ex. R.)

21.    Petitioner's Motion for an Evidentiary Hearing should be denied. While there is no indication that Petitioner failed to diligently seek to develop the factual basis underlying his claims in state court, his allegations, if true and uncontroverted by the existing record would not entitle him to habeas relief. *See* 28 U.S.C. §2254(e)(2); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998).  Therefore, Petitioner is not entitled to an evidentiary hearing.

22.    Respondent has not raised the affirmative defense of failure to exhaust state remedies. The exhaustion doctrine requires a state prisoner to fairly present his claims to the state courts before a federal court will examine them.  *See Rose v. Lundy*, 455 U.S. 509, 519 (1982).  The claims presented herein are substantially similar to the claims presented to the Supreme Court of New

Mexico through the state habeas petition. (Answer, Ex. P.) Therefore, Petitioner has exhausted state remedies with respect to these claims. *See Picard v. Connor*, 404 U.S. 270, 275 (1971).

23.     A fundamental question is how much deference must be afforded to the state decision. The state court summarily denied Petitioner's state habeas petition. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that "a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Petitioner asserts that the deferential AEDPA standard is inapplicable because the state court did not adjudicate the state habeas claims on the merits. Petitioner misreads the controlling law.

24.     The Tenth Circuit has recognized that a summary decision may qualify as a decision on the merits, provided that the decision was reached on substantive rather than procedural grounds. *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). In *Aycox*, the state district court denied habeas relief in a summary order that stated "as a matter of law, Petitioner is not entitled to relief." *Id*. The New Mexico Supreme Court denied the petition for a writ of certiorari without analysis. *Id*. The Tenth Circuit held that because there was no evidence that the state court did not reach the merits, the summary decision qualified as an adjudication on the merits. *Id*.

25.     In *Aycox*, the Tenth Circuit held:

> Thus, we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly

9

> established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. This "independent review" should be distinguished from a full de novo review of the petitioner's claims. (Citation omitted). Our review is in fact deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable.

*Aycox*, 196 F.3d at 1178.

26.     The state district judge wrote that he had reviewed the petition and the response and that "the Petition for Writ of Habeas Corpus will be and hereby is denied without a hearing." (Answer Ex. P.)  The New Mexico Supreme Court denied the application for certiorari without analysis.  (Answer Ex. R.)  As in *Aycox*, there is no indication in this case that the state court ruled on anything but the merits.  The state district judge reviewed the detailed petition and response and denied relief. The record indicates no procedural basis for the ruling.  The deferential independent review adopted in *Aycox* applies here.

27.     Petitioner claims that Mr. Williamson rendered ineffective assistance of counsel at trial. In order to obtain habeas relief for ineffective assistance of counsel, "a petitioner must establish both that his attorney's representation was deficient and that he was prejudiced by that deficiency." *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000) (*citing Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  To show his counsel was constitutionally deficient, a petitioner must demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  In order to demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

28.     Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. The inquiry is " 'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices." *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997).  A fair assessment of attorney performance requires a reviewing court "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.  "An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000); *Hatch v. Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995). Petitioner has failed to meet either prong.

29.     Petitioner claims that Mr. Williamson failed to adequately investigate and present evidence that raised questions about the veracity of C.J. Williams' testimony.  Specifically, Petitioner asserts that Mr. Williamson should have presented evidence that shortly after the murder, Williamson stated to his friend Rick Ogas that "Tom's a pussy," referring to Petitioner.  This information was contained in a statement that Ogas made to the Hobbs Police Department.  (Pet'r Ex. E.)

30.     Petitioner reasons that Williams would not have made this statement if he had just watched Petitioner murder Bonilla. This argument is a *non sequitur*.  Had the jury heard such testimony from Ogas, it could have easily concluded that Williams called Petitioner a "pussy" because he had watched Petitioner brutally murder a drunken, defenseless, homeless friend.  Strategic choices, at which counsel arrives after thorough investigation of relevant law and facts, are "virtually unchallengeable." *See Strickland*, 466 U.S. at 690. Mr. Williamson's decision not to elicit testimony regarding the "pussy" statement was a matter of sound trial strategy and he adequately impeached

11

Williams through cross examination.  Petitioner has not established the deficient performance prong of *Strickland* with respect to this issue.  Petitioner has also failed to show prejudice because introduction of the statement would not have altered the outcome of the case considering the weight of the evidence against Petitioner.

31.     Petitioner also claims that Mr. Williamson failed to adequately investigate and present evidence undermining the credibility of Williams because he did not question Petitioner's girlfriend, Jennifer Wilkerson, about a conversation that she overheard between Williams and his girlfriend, Amy Hignite. Petitioner cites a statement to police that Wilkerson made on September 20, 1999, more than a year and a half after the second trial.  (Pet'r Ex. F.)  In the statement, Wilkerson recounts that one night a few weeks before the killing, when Bonilla was passed out on Petitioner's couch, Hignite picked up a machete and stated that they could cut off Bonilla's head.  (*Id*.)  Williams laughed and said they would just have to clean up the mess and that no one would miss Bonilla because he was a bum. (*Id*.)  Wilkerson thought that Hignite and Williams were joking. (*Id*.)  Petitioner has failed to show prejudice because does not explain how this information would have changed the outcome of the trial considering the strength of the State's case against Petitioner.

32.     Petitioner claims that Mr. Williamson failed to adequately investigate and present evidence undermining the credibility of Williams because he did not present the testimony of Petitioner's father that the shovels were in his shop where he always kept them, were covered with tar from a roofing job, and showed no sign of recent use. (Pet'r Mem. Br. at 18.)  Petitioner presents no support for this statement.  Petitioner has also failed to show prejudice because he had failed to show how introduction testimony from Petitioner's father about the condition of the shovels would have altered the outcome of the case.

33.     Petitioner asserts that Mr. Williamson rendered ineffective assistance of counsel by failing to adequately investigate Tommy Shanks' criminal record and failing to use that information for impeachment.  Shanks had been convicted of misdemeanor larceny in 1996 and at the time of the second trial, he was facing charges of aggravated assault and possession of a controlled substance. (Pet'r Ex. B, C, and D.)

34.     Petitioner has demonstrated neither cause nor prejudice with respect to this claim within the meaning of *Strickland*.  With respect to the performance prong, Petitioner has failed to show that Mr. Williamson's decision not to impeach Shanks was unreasonable.  Mr. Williamson effectively cross examined Shanks through questions about his prior inconsistent testimony at the preliminary hearing.  Further impeachment of Shanks would have been cumulative.  Petitioner has also failed to show prejudice because there is no reasonable probability that further impeachment of Shanks would altered the outcome of this case.  Williams, an eyewitness, described the murder in detail and his testimony was corroborated by the condition and the location of Bonilla's body. Bonilla's partially burned wallet was found stuffed into a fence post in Petitioner's backyard.  Shanks' testimony regarding the material aspects of the murder was consistent with the testimony of the other witnesses and the evidence.  Additional impeachment would have made no difference in the outcome of the case.

35.     Petitioner claims that Mr. Williamson failed to adequately challenge both Shanks' credibility and the prosecutor's improper questions to Shanks and failed to argue to the jury that Shanks' prior lies showed he was not a credible witness.  Specifically, Petitioner argues that Mr. Williamson should have pointed out every inconsistency in Shanks' testimony, that he failed to argue in closing argument that Shanks' trial testimony was no more believable than his admittedly false

preliminary hearing testimony, that he failed to object to Shanks' direct examination testimony that Shanks believed that Petitioner murdered Bonilla, and that he elicited additional damaging testimony on cross examination of Shanks.

36.     The record establishes that Mr. Williamson effectively impeached Shanks with his prior inconsistent testimony.  The decision not to repeat this information during closing was sound trial strategy.  As for the objections, Petitioner has not demonstrated that any such objection would have been granted.  Shanks was testifying as to matters of his personal perception.  Mr. Williamson may have wanted to avoid making futile objections before the jury, or he may have wanted to avoid bringing additional attention to damaging testimony.  The best method of cross examining a witness is a matter of trial strategy.  *Pickens v. Gibson*, 206 F.3d 988, 1002 (10th Cir. 2000).  Mr. Williamson's performance was reasonable.  As for the questions that Petitioner asserts should not have been asked on cross examination, the testimony was not particularly damaging and was already in the record.  Thus, Petitioner has failed to show prejudice.

37.     Petitioner has failed to satisfy the performance prong of *Strickland* because he has failed to show that Mr. Williamson' performance was unreasonable in his handling of Shanks on the stand.  Petitioner had failed to establish the prejudice prong of *Strickland* because he has failed to show that the outcome of the case would have differed.  Williams described the murder in detail and his testimony was corroborated by the condition and the location of Bonilla's body.  Bonilla's partially burned wallet was found stuffed into a fence post in Petitioner's backyard.  Shanks' testimony regarding the material aspects of the murder was consistent with the testimony of the other witnesses and the evidence.  Additional impeachment of Shanks would have made no difference in the outcome of the case.

14

38.     Petitioner claims that Mr. Williamson performed deficiently by failing to move for disclosure of the identity of the confidential informant.  Petitioner acknowledges that during the course of the trial, it became obvious that the confidential informant was Sherry Shanks.  (Pet'r Mem. Br. at 23 n. 6.)  However, Petitioner claims that as a result of the failure to timely move for disclosure of the informant, Mr. Williamson was unable to question the informant in detail and instead questioned Detective Carter "concerning one gruesome detail of the murder after another." (Pet'r Mem. Br. at 23.)

39.     Petitioner has failed to show how the testimony from Detective Carter about what the informant told him would have materially differed from the testimony of the informant.  Additionally, Detective Carter's testimony about what the informant told him was no more gruesome than the testimony from other witnesses.  Detective Carter testified that the informant told him that Petitioner had hit Bonilla over the head with a club, strangled him, took his cash, later cut Bonilla's throat, concealed a blood spot on his carpet, and used the stolen money to get a tattoo.  (TT6 at 3.4-12.3.) Testimony from the confidential informant would not have changed the outcome of the trial. Petitioner has failed to demonstrate prejudice within the meaning of *Strickland*.

40.     Petitioner argues that the State's case would have been weakened if Mr. Williamson had been able to impeach the informant. He also claims that trustworthiness of the informant's report was elevated by Detective Carter's status as a law enforcement officer and by testimony elicited from Carter regarding reliable information previously provided by the informant.  The information reported by the informant was corroborated by the testimony of Williams and Shanks as well as the physical evidence.  Testimony about a missing piece of carpet would have minimal impact in light of the strength of the State's case.  Live testimony from the informant would not have altered the outcome

15

of the case.  Petitioner has failed to establish the prejudice prong of *Strickland* with respect to the confidential informant issue.

41.     Petitioner claims that the cumulative effect of counsel's errors amounted to ineffective assistance of counsel.   Mr. Williamson's performance was reasonable throughout the trial. Defendants "are entitled only to a reasonable and adequate defense, not the defense which, in hindsight, they believe would have been the best." *Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999).  The State's case against Petitioner was strong.  Mr. Williamson's alleged deficiencies would not have altered the outcome of the trial.  Petitioner has failed to show that he was prejudiced by any aspect of Mr. Williamson representation, regardless of whether the alleged deficiencies are considered individually or cumulatively.

42.     The state court's summary decision on Petitioner's state habeas petition is not legally or factually unreasonable.  *Aycox*, 196 F.3d at 1178.  Independent review of the record and pertinent federal law establishes that the state court's decision does not contravene or unreasonably apply clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented.   *Id.*

## RECOMMENDED DISPOSITION

I recommend that the Petition for a Writ of Habeas Corpus (Doc. 1), filed October 1, 2001, be **DENIED**, Respondent's Motion to Dismiss (Doc. 11), filed December 17, 2001, be **GRANTED**, and Petitioner's Motion for an Evidentiary Hearing (Doc. 20), filed September 6, 2002, be **DENIED**.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these second proposed findings and recommendations that party may, pursuant to 28 U.S.C. §636(b)(1)(C), file written objections to such

proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the second proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**